**No. 26-3082 (Lead)**, 26-3221 (Consolidated)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

In Re: Roman Catholic Bishop of Oakland Bankruptcy Automatic Stay Appeal

PACIFIC INDEMNITY COMPANY; et al.,

Appellants,

v. ROMAN CATHOLIC BISHOP OF OAKLAND, Debtor and OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Appellees.

Appeal from an Order of the United States District Court
for the Northern District of California
D.C. No. 3:25-cv-06836-JSC

# OPENING BRIEF OF INSURER APPELLANTS

Mark D. Plevin
Plevin & Turner LLP
(State Bar No. 146278)
580 California Street, Suite 1200
San Francisco, California 94104
(202) 580-6640 | mplevin@plevinturner.com

Jacob C. Cohn
Plevin & Turner LLP
132 W. 31st St., 9th Floor
New York, NY 10001
(202) 580-6640
jcohn@plevinturner.com
*Counsel for Appellant Continental Casualty Company*

Russell W. Roten
Skarzynski Marick & Black LLP
(State Bar No. 170571)
333 South Grand Avenue, Suite 3550
Los Angeles, California 90071
(213) 721-0650 | rroten@skarzynski.com

Catalina J. Sugayan
Clyde & Co. US LLP
30 S Wacker Drive, Suite 2600
Chicago, Illinois 60606
(312) 635-7000 |
Catalina.Sugayan@clydeco.us
*Counsel for Appellants Certain Underwriters at Lloyd's, London
and Certain London Market Companies*

Alexander Potente
(State Bar No. 208240)
Jason J. Chorley
Clyde & Co. US LLP
(State Bar No. 263225)
150 California Street, 15th Floor
San Francisco, California 94104
(415) 365-9800 |alex.potente@clydeco.us
jason.chorley@clydeco.us

Alexandra J. Wolter
O'Melveny & Myers LLP (SBN 317951)
(State Bar No. 317951)
400 South Hope Street, 19th Floor
Los Angeles, California 90071
(213) 430-6000 | awolter@omm.com
*Counsel for Appellants Pacific Indemnity Company, Century Indemnity Company, Westchester Fire Insurance Company, and Pacific Employers' Insurance Company*

## CORPORATE DISCLOSURE STATEMENTS

### Continental Casualty Company

Shares of Appellant Continental Casualty Company ("Continental") are not publicly traded. All of Continental's stock is owned by The Continental Corporation. The Continental Corporation is not publicly traded. All of the stock of The Continental Corporation is owned by CNA Financial Corporation. CNA Financial Corporation has issued shares to the public. Loews Corporation owns the majority of CNA Financial Corporation's stock. No other corporation owns 10% or more of CNA Financial Corporation's stock.

### Pacific Insurers

Each of Appellants Pacific Indemnity Company, Pacific Employers Insurance Company, Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America), and Westchester Fire Insurance Company (the "Pacific Insurers") is a wholly-owned subsidiary of ACE American Insurance Company, which is a wholly-owned subsidiary of INA Holdings Corporation, which is a wholly-owned subsidiary of INA Financial Corporation, which is a wholly-owned subsidiary of INA Corporation, which is a wholly-owned subsidiary of Chubb INA Holdings Inc., which is 80% owned by Chubb Group Holdings, Inc. and 20% owned by Chubb Limited. Chubb Group Holdings, Inc. is a wholly-owned

subsidiary of Chubb Limited. Chubb Limited, the ultimate parent corporation, is publicly traded (NYSE: CB).

**Certain Underwriters at Lloyd's, London and London Market Companies**

Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "London Market Insurers" or "LMI") are appellants. London Market Insurers are Certain Underwriters at Lloyd's, London; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co. Ltd.); the Ocean Marine Insurance Company Limited (as Part VII transferee of the World Auxiliary Insurance Corporation Limited); River Thames Insurance Company Limited; Dominion Insurance Company Limited; Companhia de Seguros Fidelidade-Mundial f/k/a Fidelidade Insurance Company of Lisbon; and R&Q Gamma Company Limited (as Part VII transferee of Anglo French Ltd.). LMI furnish the following:

- **Certain Underwriters at Lloyd's, London** have no parent company. No publicly held company owns 10% or more of their stock.
- **Catalina Worthing Insurance Limited (formerly known as Hartford Financial Products International Limited)** (as transferee of the whole of the insurance business of Excess Insurance Company Limited, [Hart Fire Insurance Company (London Branch)], is a private limited company incorporated in England and Wales with registered number 5965916 and having its registered office at 1 Alie Street, London E1 8DE, authorized

by the Prudential Regulation Authority and regulated by the Prudential Regulation Authority and the Financial Conduct Authority (FRN 468832). Catalina Worthing Insurance Limited's parent company is Catalina Holdings (Bermuda) Ltd. Catalina Holdings (Bermuda) Ltd. is owned by funds managed by affiliates of Apollo Global Management, Inc.

- **Ocean Marine Insurance Company Limited (as Part VII transferee of The World Auxiliary Insurance Corporation Limited)** Ocean Marine Insurance Company Limited's parent company is Aviva Insurance Limited. No publicly held company owns 10% or more of its stock.
- **River Thames Insurance Company Limited** is a wholly owned subsidiary of Cavello Bay Reinsurance Limited, all of whose stock is ultimately owned by Elk Topco, LLC. No publicly held company owns 10% or more of its stock.
- **Dominion Insurance Company Ltd** is 100% owned by Premia Holdings Ltd and a subsidiary of Arch Capital Group (a publicly traded company) owns more than 10% of Premia Holdings Ltd.
- **Companhia de Seguros Fidelidade-Mundial SA (f/k/a as Fidelidade Insurance Company of Lisbon)** Companhia de Seguros Fidelidade-Mundial SA has no parent company. No publicly held company owns 10% or more of its stock.

- **R&Q Gamma Company Limited (as Part VII transferee of Anglo French Ltd.**) R&Q Gamma Company's parent company is Randall & Quilter II Holdings Ltd. No publicly held company owns 10% or more of its stock.

# Table of Contents

Table of Authorities ........ iii

Jurisdictional Statement ........ 1

Issue Presented for Review ........ 2

Statement of the Case ........ 3

I. Debtor seeks bankruptcy protection to "fairly and equitably" resolve hundreds of recently-revived sexual abuse claims ........ 3

II. The bankruptcy court denies the Committee's first lift-stay motion ........ 5

III. The bankruptcy court grants the Committee's renewed lift-stay Motion ........ 7

IV. The district court affirms the bankruptcy court's lift-stay order ........ 11

V. The State Court selects, deselects, and reselects cases for stay relief based on shifting and inconsistent criteria ........ 13

Summary of the Argument ........ 19

Standard of Review ........ 22

Argument ........ 23

A. The bankruptcy court committed legal error and otherwise abused its discretion by delegating to a state court the exclusive federal judicial authority to grant stay relief to specific claimants ........ 23

1. A bankruptcy court may not delegate the decision whether to grant stay relief ........ 23

2. The State Court's rudderless process for selecting the lift-stay cases illustrates the mischief inherent in allowing bankruptcy courts to delegate their authority over lifting the automatic stay ........ 32

B. The district court erred in finding "cause" to grant relief on a deficient factual record ........ 35

Conclusion........................................................................................................................ 41

# Table of Authorities

## Cases

*Barcamerica International USA Trust v. Tyfield Importers, Inc.*,
289 F.3d 589 (9th Cir. 2002) .......... 38

*Eskanos & Adler, P.C. v. Leetien*,
309 F.3d 1210 (9th Cir. 2002) .......... 35

*Hillis Motors, Inc. v. Hawaii Automobile Dealers' Association*,
997 F.2d 581 (9th Cir. 1993) .......... 36

*In re Advanced Medical Spa Inc.*,
2016 WL 6958130 (B.A.P. 9th Cir. Nov. 28, 2016) .......... 22, 39

*In re Applin*,
108 B.R. 253 (Bankr. E.D. Cal. 1989) .......... 37

*In re Bonham*,
229 F.3d 750 (9th Cir. 2000) .......... 2

*In re Chevron U.S.A., Inc.*,
109 F.3d 1016 (5th Cir. 1997) .......... 34

*In re Computer Communications, Inc.*,
824 F.2d 725 (9th Cir. 1987) .......... 33

*In re Conejo Enters., Inc.*,
96 F.3d 346, 351 (9th Cir. 1996) .......... 22, 36, 40

*In re Curtis*,
40 B.R. 795 (Bankr. D. Utah 1984) .......... 36

*In re Diocese of Buffalo, N.Y.*, 665 B.R. 198
(Bankr. W.D.N.Y 2024) .......... 30

*In re Dunbar*,
245 F.3d 1058 (9th Cir. 2001) .......... 27, 28

*In re Enron Corp.*,
300 B.R. 201 (Bankr. S.D.N.Y. 2003) .......... 37

*In re First Yorkshire Holdings, Inc.*,
470 B.R. 864 (B.A.P. 9th Cir. 2012) .......... 37

*In re Greene*,
583 F.3d 614 (9th Cir. 2009) .......... 22

*In re Gruntz*,
202 F.3d 1074 (9th Cir. 2000) .......... 23, 24, 26

*In re Harris*, 2011 WL 3300716
(B.A.P. 9th Cir. Apr. 7, 2011) .......... 38

*In re Islet Sciences, Inc.*,
640 B.R. 425 (Bankr. D. Nev. 2022) .......... 4

*In re Kronemyer*,
405 B.R. 915 (B.A.P. 9th Cir. 2009) .......... 36

*In re Luz International, Ltd.*,
219 B.R. 837 (B.A.P. 9th Cir. 1998) .......... 37

*In re Mac Donald*,
755 F.2d 715 (9th Cir. 1985) .......... 36

*In re McGhan*,
288 F.3d 1172 (9th Cir. 2002) .......... 26, 27

*In re Plumberex Specialty Products, Inc.*,
311 B.R. 551 (Bankr. C.D. Cal. 2004) .......... 36, 37, 39

*In re Roberts*,
210 B.R. 325 (Bankr. N.D. Iowa 1997) .......... 37

*In re Roman Catholic Archbishop of Portland*,
338 B.R. 414 (Bankr. D. Or. 2006) .......... 30

*In re Roman Catholic Archbishop of San Francisco*,
Case No. 23-30564 (Bankr. N.D. Cal.) (Dkt. 1356) .......... 30

*In re Roman Catholic Diocese of Albany, N.Y.*,
Case No. 23-10244-1-pgr (Bankr. N.D.N.Y.) (Dkt. 1545) .......... 30

*In re Schwartz*,
954 F.2d 569 (9th Cir. 1992) ............ 25

*In re Strand*,
375 F.3d 854 (9th Cir. 2004) ............ 22

*In re the Roman Catholic Bishop of Sacramento*,
Adversary Proceeding No. 24-21326 (Bankr. E.D. Cal)(Dkts. 91, 97) ............ 30

*In re the Roman Catholic Bishop of Sacramento*,
Case No. 24-21326 (Bankr. E.D. Cal) (Dkts. 1441, 1497) ............ 30

*In re the Roman Catholic Bishop of Santa Rosa*,
Case No. 23-10113 (Bankr. N.D. Cal.) (Dkts 1411, 1480) ............ 30

*In re Wardrobe*,
559 F.3d 932 (9th Cir. 2009) ............ *passim*

*Interstate Fire & Casualty Co. v. Roman Catholic Bishop of Sacramento*,
2026 WL 508073 (E.D. Cal. Feb. 24, 2026) ............ 30

*MSR Exploration, Ltd. v. Meridian Oil, Inc.*,
74 F.3d 910 (9th Cir. 1996) ............ 24

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ............ 20

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
589 U.S. 35, 37-38 (2020) ............ 1

*Stern v. Marshall*,
564 U.S. 462, 473 (2011) ............ 23

*U.S. v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) ............ 22

*In 400 Walnut Assocs. LP*,
454 B.R. 601 (Bankr. E.D. Pa. 2011) ............ 33

**Statutes**

1 U.S.C. 362(a) ............ 3

11 U.S.C. 362(d) .... 6, 12

28 U.S.C. § 1334(a) .... 23

28 U.S.C. § 151 .... 21

28 U.S.C. § 157(a) .... 23, 24

28 U.S.C. 157(b)(2)(g) .... 24

28 U.S.C. 157(d) .... 23, 24

Public Law 98-353 .... 21

## Jurisdictional Statement

This is a second-level appeal from the United States Bankruptcy Court for the Northern District of California's July 25, 2025 *Order Granting the Renewed Motion of the Official Committee of Unsecured Creditors to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court* (the "Order").[1] The United States District Court for the Northern District of California's April 7, 2026 *Order re: Appeal of Relief from Automatic Stay* affirmed the Order on initial appeal (the "District Court Order").[2]

Each Appellant timely appealed from the Order within the time permitted by Bankruptcy Rules 8002(a)(1) or 8002(a)(3) and elected to have the appeal heard by the district court, pursuant to 28 U.S.C. § 158(c)(1).[3] The district court had jurisdiction over the appeal under 28 U.S.C. § 158(a)(1) because the Order was a final order.[4]

Each Appellant timely noticed its appeal from the District Court Order on May 7, 2026, pursuant to Appellate Rule 4(a)(1)(A).[5] This Court has jurisdiction

---

[1] 1-ER-018-021.

[2] 1-ER-004-016.

[3] 2-ER-169; 2-ER-181; 2-ER-193.

[4] *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37-38 (2020) (bankruptcy court's unreserved grant or denial of relief from the automatic stay "yields a final, appealable order").

[5] 5-ER-1141.

over the appeal under 28 U.S.C. § 158(d) because the District Court Order is likewise a final order.[6]

## **Issue Presented for Review**

Whether the bankruptcy court committed legal error or otherwise abused its discretion in lifting the automatic bankruptcy stay to permit six unspecified claimants with lawsuits pending in Judicial Council Coordinated Proceeding No. 5108 (the "JCCP"), concerning clergy sexual abuse, to proceed to trial in California state court because:

(1) the Order impermissibly delegated the exclusive judicial power of the federal courts to a state court by giving the JCCP Court the sole, unfettered, and unguided discretion to select which six lawsuits, out of hundreds of cases pending against The Roman Catholic Bishop of Oakland, a corporation sole (the "Debtor") in the JCCP, would be released from the stay and proceed to trial;

(2) the bankruptcy court failed to consider—much less determine—whether any of the lawsuits released from the stay were representative of the pool of JCCP lawsuits given that they were purportedly intended to serve as "bellwether" trials

---

[6] *In re Bonham*, 229 F.3d 750, 761 (9th Cir. 2000) ("appellate jurisdiction exists when the bankruptcy court order and the decision of the district court acting in its bankruptcy appellate capacity are both final orders").

spurring the parties-in-interest towards a consensual resolution of Debtor's bankruptcy case; and

(3) the Motion was unsupported by any evidence competent to demonstrate "cause" for lifting the automatic bankruptcy stay as to any lawsuit, much less six lawsuits whose alleged facts and procedural posture the bankruptcy court knew nothing about.

## Statement of the Case

### I. Debtor seeks bankruptcy protection to "fairly and equitably" resolve hundreds of recently-revived sexual abuse claims.

On May 8, 2023, Debtor petitioned the bankruptcy court for relief under Chapter 11 of the Bankruptcy Code, triggering the automatic stay of all lawsuits against it.[7] The stay was critical. Due to the passage of California Assembly Bill 218, which broadly revived otherwise time-barred child sexual abuse claims, Debtor faced over 330 lawsuits or claims at the time it filed for bankruptcy.[8] From day one, Debtor's stated intention was to "pursue a plan of reorganization that will fairly and equitably compensate abuse survivors."[9]

---

[7] 3-ER-611. The automatic stay is found in § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

[8] 3-ER-587.

[9] *Id.*

Understandably, the allegations in each sexual abuse lawsuit were factually unique. The alleged abusers occupied differing positions within the Church and included priests, nuns, members of religious orders, teachers, coaches, and other parochial school staff. The alleged abuse occurred over several decades at locations across the diocese. Prepetition, many of the cases had been consolidated for pretrial management in the JCCP in Alameda County Superior Court (the "State Court").[10] Indeed, the State Court recognized that "there is no doubt that numerous individual issues will ultimately have to be resolved" in each case.[11] Debtor claimed that it "ha[d] neither the financial means nor the practical ability to litigate all of the abuse claims in state court."[12]

The United States Trustee subsequently appointed an Official Committee of Unsecured Creditors (the "Committee") composed of nine sexual abuse claimants. The Committee's remit is to represent the interests of Debtor's unsecured creditors—overwhelmingly sex abuse claimants—*as a whole*.[13] In turn, the Committee is represented by its own bankruptcy counsel and insurance counsel.

---

10 3-ER-458-460.

11 3-ER-459.

12 3-ER-587.

13 *See, e.g., In re Islet Sciences, Inc.*, 640 B.R. 425, 451 (Bankr. D. Nev. 2022) ("creditors' committee formed in a Chapter 11 case has a fiduciary duty to all unsecured creditors rather than to individual members of the committee.").

The bankruptcy court referred Debtor, the Committee, and participating insurers to mediation in January, 2024.[14] The mediation has been guided by three mediators and proceeded along two tracks: bilateral sessions between Debtor and the Committee and multilateral sessions among Debtor, the Committee, and participating insurers.[15] The mediation has not yet resulted in a consensual plan of reorganization.

## II. The bankruptcy court denies the Committee's first lift-stay motion.

In November, 2024, the Committee filed its *Motion to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court* (the "First Motion").[16] According to the Committee, a "gating issue" precluding Debtor and the Committee from agreeing to a consensual plan was the "value" of the sexual abuse lawsuits.[17] The Committee proposed, therefore, that the bankruptcy court release six cases from the automatic stay to proceed to trial—and permit the plaintiffs to execute any resulting judgment against Debtor's insurance policies—"to help the parties gain clarity on the value of Survivor claims [and] to unlock [Debtor's] liability insurance assets."[18]

---

14 3-ER-388.

15 *Id.*

16 3-ER-412.

17 3-ER-419.

18 3-ER-419, 3-ER-438 n.13.

Although the First Motion asked the bankruptcy court to lift the automatic bankruptcy stay for "certain plaintiffs," no individual plaintiffs were identified.[19] The Committee further proffered no evidence demonstrating "cause" for any plaintiff to "jump the line" while the vast majority of their fellow claimants' cases remained stayed, and thereby deviate from the Bankruptcy Code's core goal that similarly situated creditors receive equal treatment.[20]

The First Motion thus impermissibly proposed that the bankruptcy court delegate to the State Court the authority to select six cases to proceed to trial in the JCCP. The Committee was clear on this point: the bankruptcy court would have no role in determining which cases were released from the automatic stay because the "process" of releasing cases from the stay would be "left to . . . the State Court."[21] The Committee argued that authorizing the State Court to determine which cases qualified for stay relief was both appropriate and necessary to resolve the bankruptcy case, since the State Court was supposedly guaranteed to select only "bellwether trials" that would provide all stakeholders with "clarity on the value of [claimants'] claims."[22]

---

19 *See generally* 3-ER-412-443.

20 Pursuant to 11 U.S.C. § 362(d), "[o]n request of a party in interest and after notice and a hearing," a bankruptcy court may modify the automatic stay "for cause" shown.

21 3-ER-419-420.

22 3-ER-419. *See also* 3-ER-423; 2-ER-307-308 (lines 48:25-49:2) ("That is the whole thrust of these motions, is to drive settlement by giving everybody some exposure to risk.").

The First Motion was supported exclusively by a declaration from the Committee's counsel, which merely attached filings from the JCCP and decisions from other cases in other jurisdictions that the Committee thought relevant.[23] The bankruptcy court denied the First Motion from the bench on January 21, 2025, and memorialized its ruling in a written order on February 11, 2025.[24] In its oral ruling, the bankruptcy court expressed concern that lifting the stay would not soon generate "a helpful data point" because only one of the "potential bellwether actions" could be trial-ready "anytime soon;" it was unsure how the new JCCP presiding judge would want to "handle matters," and it was "very loathe about either dictating anything in that proceeding [the JCCP] or not understanding that once I grant relief from stay, I don't want to ungrant [*sic*] it."[25]

## III. The bankruptcy court grants the Committee's renewed lift-stay motion.

Five months later, on June 25, 2025, the Committee renewed its motion (the "Motion").[26] The Motion incorporated the First Motion by reference, largely replicated its arguments, and reiterated its request for relief.[27] What was new, the Committee said, was that the bankruptcy case was "***in a dramatically different***

[23] *See generally* 3-ER-450-452.

[24] 2-ER-253 (lines 19-25); 2-ER-244-246.

[25] 2-ER-253 (lines 3-16).

[26] 2-ER-227.

[27] 2-ER-228 at fn. 2.

***place***."[28] What was so "dramatically different" according to the Committee? Debtor's Third Amended Plan of Reorganization had been voted down by the abuse claimants, and the State Court had stated that it could "expeditiously" schedule trials.[29] But, as before, no individual claimant moved for stay relief, and the Committee identified only one "likely" candidate.[30] The Committee again submitted no evidence that any claimant had "cause" for stay relief.[31]

Instead, the Committee contended that stay relief should be granted to spur the parties towards resolution, arguing at a July 16, 2025 hearing that the Motion should be granted because "[b]ellwethers work, Your Honor."[32] According to the Committee, lifting the stay to allow the JCCP judge to schedule bellwether trials was the only way to "bring this case to a consensual resolution."[33]

Appellants opposed the Motion on multiple grounds. Most fundamentally, they argued that the bankruptcy court could not permissibly grant stay relief for unspecified cases where no individual request had been made, and no

---

28 2-ER-229 (original emphasis).

29 2-ER-220-230.

30 2-ER-234.

31 *See generally* 2-ER-227-235.

32 1-ER-066 (line 3).

33 2-ER-234. *See also* 1-ER-053 (lines 14-15) ("it's the courthouse steps that motivate settlement").

individual showing of cause had been demonstrated, and that the bankruptcy court—not the State Court—must determine which cases, if any, qualified for relief from the automatic stay.[34] Appellants emphasized that "no court has ever ordered relief from the automatic stay under th[es]e circumstances."[35]

On July 25, 2025, the bankruptcy court nevertheless entered the Order granting the Motion. The Order, which contains no findings of fact, nor any explanation of the bankruptcy court's reasoning, granted the Motion and, "for the reasons set forth on the record," terminated the automatic stay "to allow six State Court Actions to proceed, as directed by the State Court."[36]

As to whether there was "cause" to lift the automatic stay, the bankruptcy court stated during the hearing that, at the time of the First Motion, "we were in the somewhat less defined place of there's a plan out there, people are talking, there's objections, maybe we end up with something resolved, maybe we don't," so the court's "instinct" was "to be much more mindful of how quickly relief from stay was going to

---

34 *See* 2-ER-220; 1-ER-084 (lines 12-16) ("So you need to know which cases are going out and notice so that everyone has an opportunity to comment on it, I think. And with all respect, I think that's actually your role. And with all respect to Judge Chatterjee, that's your job, Your Honor.").

35 2-ER-218.

36 1-ER-019.

turn into something like a trial and a verdict and a judgment or an actual determination. I'm not so stuck on those premises now."[37]

The bankruptcy court further speculated without evidentiary support that "good things could come from the ability to advance some aspects of the litigation here, that if it does happen that something is tried relatively quickly, it can only help."[38] The court apparently believed that the "good thing" was that the trials of the mystery claimants' cases might provide "information . . . whether it's resolution by settlement, or whether it's just that sense that we all need to be worried about the uncertain outcomes here."[39] Although the bankruptcy court's evidence-free speculation was highly general—indeed, the court cautioned the parties "don't try to encapsulate everything I just said"—it appears to have credited the Committee's argument that releasing six cases from the automatic stay would provide useful information about claim values.[40]

---

37 1-ER-102 (lines 2-11).

38 *Id.* (lines 12-15).

39 1-ER-103 (lines 15-20). On July 25, 2025, the bankruptcy court entered the lift-stay order. On June 16, 2026, the confirmation hearing commenced on the *Debtor's Modified Fourth Amended Plan Dated March 27, 2026*. The bankruptcy court has scheduled closing arguments on whether to confirm the Debtor's plan to take place on September 16, 2026 and thus, has not decided whether to confirm the plan. As of August 28, 2026, there has been no resolution of the Debtor's bankruptcy case.

40 1-ER-103 (lines 23-24).

## IV. The district court affirms the bankruptcy court's lift-stay order.

On appeal to the district court, Appellants argued, among other issues, the following "fundamental errors" in the Order: (1) the bankruptcy court improperly delegated its authority to the State Court to select the six cases for which the stay would be lifted; (2) the bankruptcy court entered the Order on an "empty evidentiary record;" and (3) the bankruptcy court erroneously found cause to lift the stay "without first knowing which State Court Actions were at stake."[41]

The Committee failed to rebut any of these arguments in its opposition brief. Indeed, the Committee conceded the first point: the bankruptcy court's "conclusion that there [wa]s good cause" to lift the stay was "based on the current procedural posture of the bankruptcy case" and the bankruptcy court's "understanding of how complex litigation typically proceeds," rather than on any factual proofs.[42]

With respect to the second point, the Committee asserted, without legal support, that the bankruptcy court "did not need to decide precisely which cases from the [JCCP] would be subject to stay relief."[43] Similarly, with respect to third point, the Committee reiterated its unsupported opinion that the bankruptcy court had properly

---

41 2-ER-147; 2-ER-149-151; 2-ER-152; 2-ER-155.

42 2-ER-123.

43 2-ER-122.

delegated its authority to the State Court to effectively lift the stay for six cases because the State Court would "choose bellwether trials."[44]

On April 7, 2026, the district court affirmed the Order.[45] The District Court Order opined that the bankruptcy court permissibly delegated its authority to select the lift-stay cases to the State Court.[46] Purporting to distinguish the authorities cited by Appellants for the proposition that the delegation was impermissible, the district court asserted without meaningful analysis that the Bankruptcy Code "gives the bankruptcy court wide latitude in crafting relief from the automatic stay,"[47] and that the bankruptcy's courts powers to "annul[ ], modify[ ], or condition[ ]" the automatic stay included allowing it to delegate that authority to the "state court and the stakeholders to determine" which cases to release from the stay.[48]

The district court also affirmed the bankruptcy court's holding that the supposedly "illuminating 'information'" and "pressure" resulting from lifting the stay, combined with the supposedly *de minimis* impact on the bankruptcy estate, together with the sexual abuse plaintiffs' "rejection" of Debtor's proposed plan of reorganization,

---

44 *Id.*

45 1-ER-004.

46 1-ER-009-011.

47 1-ER-011, *citing In re Wardrobe*, 559 F.3d 932, 937 (9th Cir. 2009).

48 *Id.*, *citing* 11 U.S.C. 362(d).

provided adequate "cause" to lift the bankruptcy stay.[49] The district court also rejected Appellants' other arguments, including that the Committee failed to show "cause" for lifting the automatic stay because the bankruptcy court had an insufficient factual basis to decide the Motion; and that the bankruptcy court failed to determine whether the lift stay cases were representative of other cases in the JCCP so as to truly constitute "bellwether" cases.[50]

## V. The State Court selects, deselects, and reselects cases for stay relief based on shifting and inconsistent criteria.

On August 22, 2025, the parties to the JCCP advised the State Court that the bankruptcy court had lifted the automatic stay for six cases to be chosen by the State Court.[51] Liaison counsel proposed that *John Doe OK 1022 v. RCBO* (the "*Woodall* Lawsuit") be the first case released for trial.[52] The plaintiff in the *Woodall* Lawsuit serves as the Chair of the Official Committee of Unsecured Creditors in this case. He alleged sexual abuse by serial perpetrator Stephen Kiesle.[53] In a subsequent September 19, 2025

---

49 1-ER-012-013.

50 1-ER-013-014.

51 RJN-465. Citations to "RJN" are to the exhibits appended to Appellants' Request for Judicial Notice filed contemporaneously with this brief. The exhibits have been consecutively Bates numbered in the lower righthand corner.

52 *Id.*

53 RJN-465.

case management statement, plaintiffs and Debtor recommended two additional cases.[54]

Following a September 24, 2025 case management conference, the State Court ordered the parties to "meet and confer on the selection of the six [lift-stay] cases."[55] The parties were then to report to the State Court those cases which they agreed should be released from the stay, but, absent an agreement as to all the cases, each side was to propose a maximum of ten cases, in ranked order, accompanied by a "short statement of why the recommended case should be selected."[56] To guide the parties, the State Court explained that the "principal factors" it would consider in selecting the lift-stay cases included "Whether discovery has advanced; whether the case has indicia of having a bellweather [sic] effect or includes issues that are likely to have broad applicability in the JCCP; and whether the case has insurance coverage for the defendants."[57]

In a separate order, the State Court also granted the Pacific Insurers' motion to intervene in the JCCP.[58] The court explained that, as Debtor's liability

---

[54] RJN-347.

[55] RJN-333.

[56] RJN-333.

[57] *Id.*

[58] RJN-338-340. Subsequently, the State Court granted motions to intervene by other insurers, including Continental, an appellant here.

insurers, the Pacific Insurers "have real, immediate, and concrete interests in the subject of this litigation" and expressly permitted them to participate in the selection of the six lift-stay cases.[59]

Subsequently, on October 21, 2025, plaintiffs' liaison counsel, Debtor, and the Pacific Insurers proposed their slates of lift-stay cases to the State Court.[60] Plaintiffs' liaison counsel and Debtor proposed the three cases they had previously recommended to the State Court—before it had provided any guidance as to what it was looking for—and three new ones.[61] The Pacific Insurers proposed ten cases.[62] The information provided to the State Court about the proposed cases was limited to short descriptions, including a description identifying the *Woodall* Lawsuit as a prior bellwether candidate:

> 1. John Doe OK 1022 v RCBO, Alameda case # HG19048685, P Atty Rick Simons, Matrix # 21 – Perp Kiesle. abuse years: 1975-1977). This individual survivor's case was selected by the Diocese's attorneys in 2002 and chosen by Judge Grillo to be the first bellwether in 5108 [the JCCP]. Discovery was nearly completed, until interrupted by the Chapter 11 filing. Fr. Kiesle is named in over 60 pending cases (20% of the Oakland lawsuit total), was deposed in both Clergy III and 5108, and has had no individual trial proceed in either Coordination proceeding.[63]

---

59 RJN-339.

60 RJN-201.

61 RJC-206.

62 RJN-209-210.

63 RJN-206.

On November 5, 2025, the State Court selected six cases for stay relief—three, including the *Woodall* Lawsuit, from the list jointly proposed by plaintiff liaison counsel and Debtor, and three from the Pacific Insurers' list.[64] The State Court said that it had "consider[ed] which cases are best suited for trial, considering factors such as readiness for trial, whether they present legal and factual issues common to other cases in the JCCP, and whether the parties could reasonably extrapolate the jury verdict from a trial to other cases in the JCCP."[65] The *Woodall* Lawsuit was the first lift-stay case scheduled for trial.

Debtor, plaintiff's counsel, and Appellants participated in a mandatory settlement conference in the *Woodall* Lawsuit on March 11, 2026.[66] While Appellants understood the ostensible purpose of the settlement conference was to attempt to resolve the *Woodall* Lawsuit, Mr. Woodall's counsel steadfastly refused to make any demand to settle that case alone—instead demanding that Debtor, and Appellants, resolve all 61 cases alleging abuse by Kiesle (the "Kiesle cases").[67] Due to this ambush, the settlement conference dragged on for nearly a month.

---

64 *Compare* RJN-171-172 with RJN-206-210.

65 RJN-171.

66 RJN-117.

67 RJN-117. *See also* RJN-111.

After Appellants explained to the State Court that they could not settle cases for which the automatic stay had not been lifted, the State Court judge took it upon himself to call the bankruptcy judge *ex parte* to discuss the issue with the bankruptcy judge. The bankruptcy judge reportedly told the State Court judge—without *any* briefing or argument on the issue—that Debtor's bankruptcy proceedings "do not preclude settlement of this case [the *Woodall* Lawsuit] and other cases to which the defendant is a party."[68] No resolution was ultimately achieved. After Debtor stipulated to liability, a damages trial was held in the *Woodall* Lawsuit and a verdict rendered on April 22, 2026.[69]

On May 21, 2026, plaintiffs' liaison counsel and Debtor filed a *Joint Case Management Statement* stating that the State Court had formed a "tentative [] plan to proceed with identify 5 Fr. Kiesle cases that may be expedited for trials (in place of the current 5 cases set for trial)."[70] Plaintiffs and liaison counsel said they understood that

> the Court's intent is to accelerate the process by providing more information (data points—verdicts) more quickly that benefits all interested parties, including the State Court and Coordination Trial Judge in JCCP 5108, Bankruptcy Court, Plaintiffs, RCBO, and various interested insurers, with the goal of resolution of at best, the entire RCBO caseload, and ***at a minimum, the approximately 60 Kiesle ordination to arrest era (May 1972 to August 1978) pending cases***.[71]

---

68 RJN-165. *See also* RJN-117.

69 RJN-106.

70 RJN-100.

71 RJN-100 (Emphasis added).

To that end, plaintiffs' liaison counsel proposed five cases, and RCBO four, in which Kiesle was the alleged perpetrator.[72] The Pacific Insurers objected to the State Court's proposed reconsideration of the slate of lift-stay cases, noting that they "were not given notice of the proposal that the Court reconsider" its original case selections.[73]

The State Court ultimately backed away from its all-Kiesle proposal—but not from deselecting and reselecting cases. On May 27, 2026, the State Court held a case management conference at which it requested that the parties identify ten cases, from which the court would choose five to proceed through trial.[74] The court proposed selecting two Kiesle cases and three "from the other seven prolific perpetrators."[75] In a June 10, 2026 joint case management statement, Debtor and Plaintiffs proposed a new slate of lift-stay cases, including four Kiesle cases, as well as "a mix of proposed cases by each side involving alleged perpetrators with significant case volume."[76]

---

72 RJN-100-102.

73 RJN-092.

74 RJN-081-82 (28:25-29:1); RJN-083 (line 1).

75 RJN-081-82 (28:25-29:1).

76 RJN-046.

On July 1, 2026, the State Court vacated all deadlines in, and stayed, the remaining five original lift-stay cases from November 2025.[77] The court then chose five new cases, but requested that the parties further confer regarding whether one of the new cases was "estate neutral"—*i.e.*, covered by insurance—and stated that, should the case not be "estate neutral," the alternate case would move forward.[78] Debtor subsequently requested that the State Court replace one case because it was not "estate neutral," but, in a July 21, 2026 order, the Court again ordered the parties to meet and confer over whether the case was "estate neutral."[79]

**Summary of the Argument**

Equality of treatment of similarly situated creditors is a core bankruptcy tenet. The automatic stay stops the "race to the courthouse" to enable the orderly marshalling of debtor's property in its bankruptcy estate. A creditor seeking nevertheless to proceed with litigation against the debtor and its property must move for relief from the stay and show, by competent evidence, that it has "cause" for such an exception. None of that happened here.

Here, the Committee, alone, moved for stay relief—but not on behalf of any specific claimants—and did so with no evidence to support the relief it sought.

77 RJN-010.

78 RJN-010 n.1.

79 RJN-004.

Worse still, it didn't even ask the bankruptcy court to choose the claimants whose cases would be allowed to proceed to trial (and who would be permitted to seek to collect any judgments from Debtor's insurers). Instead, it asked the bankruptcy court to delegate to the State Court the selection of the six claimants who would be the beneficiaries of the bankruptcy court's lift-stay order, which the bankruptcy court proceeded to do.

This was reversible error—on several levels. First, not only did the bankruptcy court grant stay relief that is unprecedented in the Ninth Circuit, but in doing so, it impermissibly delegated the judicial power of the United States to a state court to select six cases to proceed to trial, instead of doing its own job—determining whether a particular claimant has shown adequate "cause" on the basis of a factual record supported by competent evidence to justify making an exception for that creditor from the automatic stay. Such a delegation of authority—by an Article I court already exercising, by delegation, the congressionally-mandated exclusive bankruptcy jurisdiction of the Article III district court—is impermissible. Indeed it is akin to the flaw in the original 1978 Bankruptcy Code that violated constitutional separation of powers by delegating to bankruptcy courts the judicial power of the United States without providing for necessary supervision by Article III courts.[80] This flaw required

---

[80] *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

a congressional "fix," the Bankruptcy Amendments and Federal Judgeship Act of 1984, establishing bankruptcy courts as "units" of district courts to ensure that the judicial power of the United States remains in Article III courts where it belongs.[81] Indeed, the rudderless process by which the State Court selected, deselected, and reselected cases for stay relief demonstrates the risk in permitting bankruptcy courts to delegate their authority over lifting the automatic stay. For this reason alone, the Order must be vacated.

Impermissible delegation aside, the Order in effect granted stay relief to six unidentified "pigs in a poke." But that is not how stay relief works. There must first be competent evidence from which a bankruptcy court can make a factual determination that "cause" exists to grant stay relief to a creditor—an impossible task where, as here, no moving creditor exists and no creditor was identified by the Committee as being the subject of its lift-stay motion. The bankruptcy court's familiarity with its own proceedings is no substitute for identifying the individuals seeking stay relief, and providing evidentiary proof of "cause" to terminate the stay. The district court's contrary conclusion was legal error.

This Court should reverse the district court, vacate the Order, and remand with instructions to deny the Motion.

---

[81] Pub. L. 98-353. *See* 28 U.S.C. § 151 (establishing bankruptcy courts as "unit[s]" of the district courts.

**Standard of Review**

Decisions granting or denying relief from the automatic stay are reviewed for abuse of discretion.[82] Courts in the Ninth Circuit apply a two-part test to determine whether the lower court abused its discretion.[83] The first step is to determine *de novo* whether the bankruptcy court identified and applied the correct legal rule to the relief requested.[84] If the bankruptcy court failed to do so, it abused its discretion.[85] The second step is to determine whether the bankruptcy court's "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."[86] If any of these three apply, the bankruptcy court abused its discretion.[87]

"This court reviews de novo a district court's decision on appeal from a bankruptcy court,"[88] without giving any deference to the district court's decision or determinations.[89]

---

82 *In re Conejo Enters., Inc.*, 96 F.3d 346, 351 (9th Cir. 1996).

83 *U.S. v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009). *See also In re Advanced Med. Spa Inc.*, 2016 WL 6958130, *3 (B.A.P. 9th Cir. Nov. 28, 2016) (applying the standard set forth in *Hinkson* to an appeal from an order denying relief from the automatic stay).

84 *See Hinkson*, 585 F.3d at 1262-63.

85 *Id.* at 1262.

86 *Id.* (quotations omitted).

87 *Id.*

88 *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009).

89 *See In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004).

## ARGUMENT

### A. The bankruptcy court committed legal error and otherwise abused its discretion by delegating to a state court the exclusive federal judicial authority to grant stay relief to specific claimants.

#### 1. A bankruptcy court may not delegate the decision whether to grant stay relief.

"With certain exceptions not relevant here, the district courts of the United States have 'original and exclusive jurisdiction of all cases under title 11.'"[90] Each district court, in turn, "may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."[91] And, pursuant to § 157(d), the referring district court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."

Thus, per 28 U.S.C. § 1334(a), district courts—and *only* district courts—have "original and exclusive jurisdiction" over bankruptcy cases.[92] And, per § 157(a), district courts may refer bankruptcy cases and "proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy courts in their districts—

---

90 *Stern v. Marshall*, 564 U.S. 462, 473 (2011), quoting 28 U. S. C. § 1334(a).

91 28 U.S.C. § 157(a).

92 *See also In re Gruntz*, 202 F.3d 1074, 1080 (9th Cir. 2000) ("By the plain wording of [§ 1334(a)], Congress has expressed its intent that bankruptcy matters be handled exclusively in a federal forum").

and *only* to those bankruptcy courts, which function as adjunct to the district courts in which they are located, subject *always* to the supervision of those district courts, which, per § 157(d), can withdraw the reference at any time and continue to preside over a bankruptcy case directly. Because a district court cannot refer a bankruptcy case or proceeding anywhere other than to the bankruptcy court within its district, *a fortiori*, a bankruptcy court to which a case or proceeding has been referred cannot refer or delegate such a case or proceeding anywhere else—certainly not to a state court.

A motion to terminate, annul, or modify the automatic stay is, of course, a core bankruptcy proceeding within the "original and exclusive jurisdiction" of district courts.[93] It is axiomatic that "[a] state court does not have the power to modify or dissolve the automatic stay."[94] "Whether creditors should be deterred, and when, is a matter unique to the flow of the bankruptcy process itself – a matter solely within the hands of the federal courts."[95] Indeed, "a mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*., demonstrates Congress's intent to create a whole system *under federal control*…."[96]

---

93 28 U.S.C. § 157(b)(2)(G) ("motions to terminate, annul, or modify the automatic stay" are "core" proceedings that may be heard and determined by bankruptcy judges).

94 *In re Gruntz*, 202 F.3d at 1087.

95 *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 916 (9th Cir. 1996).

96 *Id.* at 914. (emphasis added).

Instead of policing its own congressionally-mandated exclusive jurisdiction, the district court rejected Appellants' argument that the bankruptcy court is without authority to further delegate its own authority—delegated to the bankruptcy court by the district court—to control the metes and bounds of the automatic stay to a state court. The district court, instead, ruled—with no real analysis—that the bankruptcy court's unprecedented delegation to the State Court of its authority and responsibility to select specific cases to be released from the automatic stay somehow fell within the bankruptcy court's "wide latitude in crafting relief from the automatic stay."[97]

This was error, plain and simple. Whatever "latitude" a bankruptcy court may have "in crafting relief from the automatic stay" must be exercised in a manner consistent with the exclusive federal jurisdiction of district courts as mandated by Congress. District courts have no "latitude" to deviate from this bedrock jurisdictional requirement, and neither do their subordinate bankruptcy court "units" to which cases or proceedings have been referred.

Nor can the district court's meager and erroneous rationale be squared with Ninth Circuit precedent rejecting a bankruptcy court's deference to state courts

---

[97] 1-ER-011, citing *In re Wardrobe*, 559 F.3d 932, 937 (9th Cir. 2009), quoting *In re Schwartz*, 954 F.2d 569, 572 (9th Cir. 1992).

regarding bankruptcy matters as improper encroachments on exclusive federal authority:

In *In re Gruntz*, this Court rejected a bankruptcy court's finding that it was collaterally estopped from reviewing a state court's determination that the automatic bankruptcy stay did not bar a debtor's state convictions for failure to pay child support.[98] The county that prosecuted the debtor argued that where a state court determines that the "automatic stay does not apply," federal courts are divested of "jurisdiction to consider that question." This Court disagreed explaining that there is nothing improper in a bankruptcy court enforcing an automatic stay "that issues from its own federal statutory authority" and that the county's proffered rule "would undermine the principle of a unified federal bankruptcy system, as declared in the Constitution and realized through the Bankruptcy Code."[99]

In *In re McGhan*, this Court held that a bankruptcy court abused its discretion in refusing to reopen the debtor's bankruptcy case to enforce its prior discharge order and injunction in deference to a state court's determination that a creditor could pursue his sexual abuse claim against the debtor because the creditor had purportedly received inadequate notice of the debtor's bankruptcy proceedings.[100]

---

98 *In re Gruntz*, 202 F.3d 1074, 1083 (9th Cir. 2000).

99 *Id* at 1078. This Court ultimately found that the automatic stay did not enjoin the criminal prosecutions. *Id.* at 1077.

100 *In re McGhan*, 288 F.3d 1172, 1175 (9th Cir. 2002).

After concluding that the "bankruptcy court erroneously assumed that the state court had jurisdiction to modify the discharge order and injunction" expressly discharging the creditor's claim and enjoining any attempt to recover on it, this Court went "further and h[e]ld that the bankruptcy court should have reopened the proceedings."[101]

This Court explained in *McGhan* that "'[a] Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant.' A bankruptcy court may not decline to invoke this power in the face of a clearly invalid state court action infringing upon the bankruptcy court's exclusive jurisdiction."[102] In reaching this conclusion, the Ninth Circuit explained *Gruntz*'s "broader implications" including that "state courts lack jurisdiction in the first instance to modify the stay."[103]

In *In re Dunbar*, this Court affirmed the decision of the Bankruptcy Appellate Panel "that the bankruptcy court erred in finding itself precluded from reviewing the judgment" of a state administrative law judge that the automatic bankruptcy stay did not bar the proceedings before it.[104] There, the debtor sought an injunction from the bankruptcy court preventing the California state licensing board for construction contractors from enforcing its order, originally issued by an

---

101 *Id.* at 1176, 1177, 1181-82.

102 *Id.* at 1182 (internal citations omitted).

103 *Id.* at 1179.

104 *In re Dunbar*, 245 F.3d 1058, 1064 (9th Cir. 2001).

administrative law judge and adopted by the board, against him on the grounds that it violated the automatic bankruptcy stay.[105] "The bankruptcy court concluded that the ALJ's determination that the proceedings were excepted from the automatic stay was binding under the principles of collateral estoppel."[106] This Court's ruling affirming the BAP's reversal of the bankruptcy court's ruling explained that "*Gruntz's* central premise is that Congress has plenary power over bankruptcy and vested that power exclusively in the district courts. At least with respect to 'core' bankruptcy proceedings (of which hearings to determine the scope of the automatic stay are a type) the federal courts have final authority."[107]

While it is true that none of these cases are directly on point factually, that is because what the bankruptcy court did here is unprecedented. But each of these cases stand for the fundamental proposition that Congress vested the bankruptcy power of the United States exclusively in the district courts—*and nowhere else*. These cases all stand for the proposition that the exclusive bankruptcy jurisdiction of the district courts cannot be usurped or even exercised by state tribunals—and that a bankruptcy court has an affirmative duty to invoke its implied power to police the congressional grant of exclusive jurisdiction.

---

105 *Id.* at 1060-61.

106 *Id.* at 1061.

107 *Id.* at 1062-63 (internal citations omitted).

Just as the district court's exclusive adjudicative authority over bankruptcy cases and proceedings cannot be taken by a state court, it cannot be given away to a state court either—not by a district court, and not by its adjunct bankruptcy court. Yet, that is *exactly* what the bankruptcy court did here in deputizing the State Court to select specific cases to be released from the automatic stay. The bankruptcy court merely chose the number of cases that would be permitted to proceed to trial and delegated complete, unguided authority to the State Court to choose which ones. Indeed, the bankruptcy court expressly eschewed any involvement in the selection process—and was not even consulted on the "reselection" process whereby the State Court switched the cases, effectively reimposing the automatic stay on five cases and lifting the stay for five other cases.

Moreover, the case on which the district court rested its conclusion that the bankruptcy court's delegation was within its "wide latitude in crafting relief from the automatic stay"—*In re Wardrobe*—cannot bear that weight.[108] In *Wardrobe*, this Court found that a state court, in effect, impermissibly broadened the scope of stay relief the plaintiff received by permitting her to litigate claims against the debtor that had not been pled at the time she sought stay relief, and, in seeking stay relief, she sought only to proceed with her claims against defendants other than the debtor.[109] The

108 559 F.3d 932, 937 (9th Cir. 2009).

109 *Id.* at 933-934, 937.

*Wardrobe* court reaffirmed a lift-stay movant's obligation to clearly identify the claims at issue to "ensure[ ] that the bankruptcy court is fully apprised of the nature of the lawsuit so that the court can determine whether cause exists to grant relief from stay."[110] *Here*, the bankruptcy court necessarily had no information about the underlying cases that would be released from the stay because they would be selected by the State Court.

Indeed, this factor distinguishes this case from the diocesan lift-stay cases cited by the Committee to the courts below. In those cases, the specific cases for which stay relief was sought were identified for the bankruptcy court.[111] It is the norm in this

---

[110] *Id* at 936-937.

[111] *See In re Roman Catholic Archbishop of San Francisco*, Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. 1356 at 36 (identifying 5 proposed lift-stay cases); *In re Roman Catholic Diocese of Albany, N.Y.*, Case No. 23-10244-1-pgr (Bankr. N.D.N.Y.), Dkt. 1545 (granting relief from the automatic stay on motions by six individual claimants, accompanied by a supporting memorandum from the Tort Claimants Committee); *In re Diocese of Buffalo, N.Y.*, 665 B.R. 198, 200 (Bankr. W.D.N.Y 2024) (17 claimants moved for stay relief); *In re Roman Catholic Archbishop of Portland*, 338 B.R. 414, 417 (Bankr. D. Or. 2006) (111 claimants moved for stay relief); *In re the Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113 (Bankr. N.D. Cal.), Dkt. 1411 (identifying three specific cases for stay relief), 1480 (granting stay relief). In *In re Roman Cath. Bishop of Sacramento*, the bankruptcy court approved a stipulation in an adversary proceeding between the debtor and the creditors' committee that, *inter alia*, lifted the automatic stay to permit up to six unidentified claimants to pursue their claims against the debtor-diocese in state court. *In re the Roman Catholic Bishop of Sacramento,* Adversary Proceeding No. 25-02054 (Bankr. E.D. Cal.), Dkt. 91. Subsequently, the debtor and committee identified four cases to be released from the automatic stay. *Id.* at Dkt. 97. Thereafter, the debtor sought approval of the stipulation in its main bankruptcy case, which was granted. *In re the Roman Catholic Bishop of Sacramento*, Case No. 24-21326, Dkt. 1441 (motion to approve stipulation modifying the automatic stay), Dkt. 1497 (granting motion). *See also Interstate Fire & Cas. Co. v. Roman Catholic Bishop of Sacramento*, 2026 WL 508073, *1-2 (E.D. Cal. Feb. 24, 2026) (explaining procedural history of bankruptcy court's approval of stipulation on

Circuit that to warrant stay relief, a movant must prove *to the bankruptcy court* that stay relief is required *in a specific lawsuit*.[112] Such specificity "forces creditors to disclose the causes of action they intend to pursue and ensures that the bankruptcy court is fully apprised of the nature of the lawsuit so that the court can determine whether cause exists to grant relief from the stay."[113]

A bankruptcy court cannot grant stay relief for unidentified cases brought by unidentified claimants and then leave to a state tribunal the task of deciding which specific claimants get to "jump the line" with stay relief. The fact that stay relief has been granted in other diocesan bankruptcy and "mass tort" cases, as the Committee has argued, does nothing to alter these bedrock prerequisites to stay relief.

The bankruptcy court committed a basic and serious legal error by abdicating its responsibility to select specific claimants as to whom the stay should be lifted and instead delegating that core bankruptcy function to a state court. This legal error requires correction by this Court, which should reverse the District Court Order, vacate the Bankruptcy Court Order, and remand with instructions to deny the Motion to lift the stay.

---

appeal to district court). Accordingly, by the bankruptcy court was eventually made aware of the specific cases for which stay relief was sought by the time it approved the stipulation in the bankruptcy.

112 *See In re Wardrobe*, 559 F.3d at 936-37.

113 *Id.*

**2. The State Court's rudderless process for selecting the lift-stay cases illustrates the mischief inherent in allowing bankruptcy courts to delegate their authority over lifting the automatic stay.**

The meandering and inconsistent process by which the State Court selected, deselected, and reselected the lift-stay cases reinforces that the State Court has been exercising (or at least purporting to exercise) authority belonging solely to the bankruptcy court. Consider what happened:

(1) The State Court initially selected six cases for stay-relief based on the ranked choice recommendations of Debtor/plaintiffs' liaison counsel and the Pacific Insurers based on nothing more than a single paragraph summary of each case.[114] The parties' recommendations were based only on a loose set of principles articulated by the State Court including the state of discovery in the case, whether the case had any "indicia" of a bellwether "effect," and the availability of insurance coverage. It is hardly surprising that three of the five cases Debtor/plaintiffs' liaison counsel recommended to the Court were those voluntarily offered to the

---

[114] RJN-171-172.

Court before it had established any criteria for cases to be evaluated for stay-lifting.[115]

(2) Then, the State Court permitted a settlement conference intended to resolve a single lift-stay case to be hijacked and turned into a series of settlement conferences to resolve 60 other cases involving the same alleged perpetrator, Stephen Kiesle.[116] As part of this process, the State Court conducted *ex parte* conversations with the bankruptcy court in which the bankruptcy court reportedly told the State Court—without the benefit of briefing or argument—that a single plaintiff's demand to settle cases unquestionably subject to the automatic stay somehow did not constitute stay violations.[117]

---

115 RJN-465 (recommending *John Doe OK 122)*; RJN-347 (recommending *John Doe OK 1522* and *Jane Doe 105*); RJN-206 (recommending *John Doe OK 1022*, *John Doe Ok 1522*, and *Jane Doe 105*).

116 RJN-165.

117 *Id.* To the contrary, a post-bankruptcy demand that a debtor or its insurers pay a pre-bankruptcy claim violates the automatic stay. *See, e.g., In re Computer Communications, Inc.*, 824 F.2d 725, 729-31 (9th Cir. 1987) (parties are barred by the automatic stay from engaging in self-help to seek payment of pre-petition claims); *In re Enron Corp.*, 300 B.R. 201, 212-13 (Bankr. S.D.N.Y. 2003) (sending demand letters violates the automatic stay); *In re 400 Walnut Assocs. LP*, 454 B.R. 601 (Bankr. E.D. Pa. 2011) (post-petition letter sent to debtor's subtenants demanding that rents be paid to it violated automatic stay).

(3) After the *Woodall* Lawsuit was tried, the State Court considered scrapping the remaining slate of lift-stay cases in favor of trying five Kiesle cases[118]; and

(4) Although the State Court reconsidered its plan to try only Kiesle cases, it reimposed the stay as to the five non-*Woodall* cases it originally selected, and then selected a new slate of cases to release from stay based on the recommendations of the plaintiffs' liaison counsel and RCBO alone (over insurer objections).[119]

The bankruptcy court's delegation of its power over the automatic stay—to permit the State Court to select the lift-stay cases based on only thin factual summaries of cases recommended by counsel[120] and to make strategic decisions about whether, in effect, 61 cases could be released from the automatic stay—was error. The State Court's unfettered discretion over the lift-stay cases cannot be squared with the federal court's exclusive jurisdiction over the automatic stay's application. As this Court

---

118 RJN-100-102.

119 RJN-010-11.

120 Notably, while *one* of the factors considered by the State Court was whether the proposed cases were "representative" of the larger set of claims facing Debtor, it never made any findings of fact to this effect, or even explained why it chose the cases it did. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) (finding that trial of 30 claims against defendant was "not a bellwether trial" where it was "simply a trial of fifteen (15) of the 'best' and fifteen (15) of the 'worst' cases contained in the universe of claims" selected by plaintiffs and defendants).

explained in *In re Wardobe*, one purpose of the stay is that it "gives *the bankruptcy court* an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations."[121] To the extent that there was any effort at "harmonizing" here, it was by the State Court through its crazy-quilt approach to stay relief.

Moreover, one motivating consideration of the Court's holding in *Wardrobe* that the scope of stay relief was limited by the posture of the underlying case at the time relief was sought, or which was "specifically requested in the motion," is so that the "*the bankruptcy court* is fully apprised of the nature of the lawsuit so that the court can determine whether cause exists to grant relief from the stay."[122] Here, however, it was only the State Court that gave any consideration to the facts of the underlying cases in deciding which cases to release from stay, and the facts which were germane to the State Court's thinking were, evidently, often shifting.

### B. The district court erred in finding "cause" to grant stay relief on a deficient factual record.

The automatic stay "serves as one of the most important protections in bankruptcy law."[123] The automatic stay "gives the bankruptcy court an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's

---

[121] 559 F.3d 932, 934 (9th Cir. 2009) (emphasis added).

[122] *Id.* at 936-937 (emphasis added).

[123] *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214 (9th Cir. 2002).

assets for repayment and reorganization of [its] obligations."[124] The automatic stay thus "plays a vital and fundamental role in bankruptcy" by ensuring that "all claims against the debtor will be brought in a single forum, the bankruptcy court."[125] To that end, the bankruptcy court may only lift the automatic stay when a movant demonstrates, with factual proof, that "cause" exists to lift the stay under § 362(d)(1).[126]

"'Cause' has no clear definition and is determined on a case-by-case basis."[127] In this Circuit, courts consider the non-exclusive "*Curtis*" factors[128] in determining "whether to grant relief from the automatic stay to allow pending litigation to continue in another forum."[129]

---

124 *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985).

125 *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993) (internal citations omitted).

126 *In re Plumberex Specialty Prods., Inc.*, 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004) (citation omitted).

127 *In re Conejo Enters., Inc.*, 96 F.3d 346, 352 (9th Cir. 1996).

128 40 B.R. 795 (Bankr. D. Utah 1984). The *Curtis* factors purportedly considered by the bankruptcy were: (i) whether the relief will result in a partial or complete resolution of the issues and (ii) the lack of any connection with or interference with the bankruptcy case. 1-ER-012-013 (describing the bankruptcy court as having evaluated the first and second *Curtis* factors).

129 *See In re Kronemyer*, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009).

Factual proof is evidence admissible under the Federal Rules of Evidence.[130] Bare legal arguments cannot satisfy a movant's burden to make out a *prima facie* showing of cause.[131] Indeed, bankruptcy courts must "find the facts specifically and state its conclusions of law separately" in granting or denying stay relief.[132] Bankruptcy courts must have admissible evidence to do so.

Here, the Committee presented no competent evidence concerning any specific claimant or lawsuit. The First Motion and the Motion relied on counsel's declarations[133] re-attaching the Committee's prior bankruptcy court filings,[134] the bankruptcy court's hearing transcripts,[135] hearing transcripts from the JCCP[136] and non-precedential decisions from bankruptcy courts outside the Ninth Circuit.[137] The

---

130 *See In re Applin*, 108 B.R. 253, 257 (Bankr. E.D. Cal. 1989). *See also In re Luz Int'l, Ltd.*, 219 B.R. 837, 843 (B.A.P. 9th Cir. 1998) ("Appellees presented documentary evidence that supported [their] position that relief from stay should be granted").

131 *See In re Plumberex,* 311 B.R. at 557 n.11 ("A *prima facie* case requires the movant to establish 'a factual and legal right to the relief that it seeks."). *See also In re Roberts*, 210 B.R. 325, 329 (Bankr. N.D. Iowa 1997) (in "bankruptcy motion practice, one easily loses sight of some of such basics as the need to make out a *prima facie* case by competent evidence").

132 *In re First Yorkshire Holdings, Inc.*, 470 B.R. 864, 871 (B.A.P. 9th Cir. 2012).

133 *See* 3-ER-450-452; 2-ER-240-242 (voluminous exhibits omitted).

134 *See Id.*

135 *See Id.*

136 *See Id.*

137 *See id.* Among other inapposite "precedent," the Committee provided a hearing transcript excerpt from a case in which the debtor had *consented to* lift the stay in specific

Committee therefore supplied no admissible proof from which the bankruptcy court could determine what cause existed for any particular case.

The Committee argued that stay relief was warranted under the first *Curtis* factor because the State Court would schedule bellwether trials, relief would resolve issues and advance settlement, and other bankruptcy courts had granted stay relief under purportedly similar circumstances.[138] But, "the arguments and statements of counsel are not evidence."[139] Nevertheless, the bankruptcy court treated the Committee's legal arguments that terminating the stay would resolve the bankruptcy case as factual support and entered an order containing no findings of fact.

The district court compounded the error by relying on the bankruptcy court's "familiarity" with "the status of its own proceedings," in which settlement discussions appeared to have stalled, and counsel's account of "the state court's

cases, which the Committee baselessly concluded was "applicable here." *See* 2-ER-232 fn. 17.

138 *See, e.g.*, 2-ER-230 (citing JCCP hearing transcript as proof that the JCCP judge could "expeditiously" schedule trials); 2-ER-231-232 (citing hearing transcripts from other bankruptcy cases as proof that "bankruptcy courts overseeing nonprofit sexual abuse cases across the country have recently granted stay relief to jumpstart stalled mediation").

139 *See Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (internal quotations omitted). *See also In re Harris*, 2011 WL 3300716, *6 (B.A.P. 9th Cir. Apr. 7, 2011).

proceedings,"[140] rather than any factual proof.[141] Treating counsel's arguments as evidence was legal error requiring reversal and remand to the bankruptcy court.

Further, the reason there is no evidence is because the Committee was not even trying to show "cause" for specific cases to proceed. Rather, it had an ulterior motivation—to pressure insurers in connection with the ongoing bankruptcy court mediation. As the Committee sees it, "Debtor's inability to prosecute its" declaratory relief lawsuit regarding insurance coverage "against the Insurers has impeded the path to global resolution because it has failed to force the Insurers to come to the table and negotiate fairly and in good faith."[142] Lifting the stay, in the Committee's view, was desirable to ratchet up pressure on the insurers by putting them "at risk of state-law consequences for refusing to settle cases."[143] The Insurers wholly reject the assertion that they have not negotiated in this case in good faith. Nonetheless, both the bankruptcy court and the district court accepted that the additional "pressure"

---

[140] *See* 1-ER-013.

[141] The precedent cited in the District Court Order itself reinforces that a bankruptcy court cannot terminate the automatic stay in the absence of factual proof sufficient to "establish a prima facie case that 'cause' exists." 1-ER-012, *citing In re Advanced Med. Spa Inc.*, 2016 WL 6958130, at *4 (B.A.P. 9th Cir. Nov. 28, 2016) (to warrant stay relief, the movant must "first establish a prima facie case that 'cause' exists"). *See also In re Plumberex Specialty Prods.*, 311 B.R. at 565 ("the inquiry called for by motions to lift the automatic stay [is] very fact-specific").

[142] 3-ER-421.

[143] *Id.*

purportedly created by permitting the lift-stay cases to proceed were legitimate bases for lifting the stay.[144]

Authority from this Court, however, strongly suggests—even if it did not expressly hold—that obtaining leverage over another participant in a bankruptcy is not an appropriate basis for lifting the automatic stay. In *In re Conejo Enterprises*, this Court reversed a district court that found the bankruptcy court abused its discretion in declining to lift the automatic stay.[145] One reason that the bankruptcy court declined to lift the stay was to "preserve[ ] a level playing field for negotiation of a consensual reorganization plan."[146] Indeed, like the Committee here, the state court claimant seeking stay relief in *Conejo* "admitted to the bankruptcy judge that it was seeking relief from the stay to strengthen its position against [debtor] and other creditors in negotiating a reorganization plan."[147] As the *Conejo* bankruptcy court explained, "giv[ing] one side or the other a strategic advantage just for the sake of reaching a resolution of this matter" was "the most inappropriate thing I could possibly do."[148]

---

[144] 1-ER-014 ("Also plausible is the bankruptcy court's conclusion allowing six cases to proceed would 'create additional pressure[ ]' to 'focus[ ] people on the need to come together as much as they can, to express what their differences are and to try to get to a resolution here that might even be consensual'").

[145] 96 F.3d 346, 354 (9th Cir. 1996).

[146] *Id.* at 352.

[147] *Id.* at 353.

[148] *Id.*

The Committee's effort to lift the automatic stay for the purpose of pressuring the insurers to settle is equally inappropriate and further shows that the bankruptcy court abused its discretion by putting its thumb on the scale for the purpose of giving strategic advantage to one constituency at the expense of another.

## Conclusion

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court Order, vacate the bankruptcy court's Order, and remand with instructions to deny the Motion.

Respectfully submitted,

Dated: August 28, 2026

By: /s/ Jacob C. Cohn

Jacob C. Cohn
PLEVIN & TURNER LLP
132 W. 31st St., 9th Floor
New York, NY 10001
(202) 580-6640
jcohn@plevinturner.com

Mark D. Plevin
PLEVIN & TURNER LLP
(State Bar No. 146278)
580 California Street, Suite 1200
San Francisco, California 94104
(202) 580-6640
mplevin@plevinturner.com

*Counsel for Appellant Continental Casualty Company*

Alexander Potente
(State Bar No. 208240)
Jason J. Chorley
CLYDE & CO. US LLP
(State Bar No. 263225)
150 California Street, 15th Floor
San Francisco, California 94104
(415) 365-9800
alex.potente@clydeco.us
jason.chorley@clydeco.us

Tancred V. Schiavoni (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 326-2000
tschiavoni@omm.com

Alexandra J. Wolter
O'MELVENY & MYERS LLP
(State Bar No. 317951)
400 South Hope Street, 19th Floor
Los Angeles, California 90071
(213) 430-6000
awolter@omm.com

*Counsel for Insurance Company of North America, Westchester Fire Insurance Company, Pacific Indemnity Company, and Pacific Employers Insurance Company*

Russell W. Roten
Jeff D. Kahane
Timothy W. Evanston
SKARZYNSKI MARICK & BLACK LLP
333 South Grand Avenue, Suite 3550
Los Angeles, California 90017
Telephone: (213) 721-0650
rroten@skarzynski.com
jkahane@skarzynski.com

tevanston@skarzynski.com
Catalina J. Sugayan
CLYDE & CO US LLP
30 S Wacker Drive, Suite 2600
Chicago, IL 60606
Telephone: (312) 635-7000
Catalina.Sugayan@clydeco.us

*Counsel for Appellants Certain Underwriters at Lloyd's, London and Certain London Market Companies*

154352.7

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-3082 (Lead), 26-3221 (consolidated)

I am the attorney or self-represented party.

**This brief contains** 9,217 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- ■ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ________.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jacob C. Cohn **Date** August 28, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*